IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No.: 21-cv-00420

**DAVIDA VIGIL,**
**KRICYNDA HALVERSON, and**
**MARIA MARTINEZ,**

    Plaintiffs,

v.

**CITY OF NORTHGLENN, a Colorado municipality,**
**OFFICER JORDAN GILLETTE, in his individual capacity,**
**OFFICER CAMERON WOODS, in his individual capacity,**
**OFFICER LUKE SCHWARTZ, in his individual capacity,**
**OFFICER PRISCILLA DUKE, in her individual capacity,**
**OFFICER JOEL MAYNS, in his individual capacity,**
**OFFICER JEREMY MAYNS, in his individual capacity, and**
**OFFICER DYLAN CHAVEZ, in his individual capacity,**

    Defendants.

## COMPLAINT AND JURY DEMAND

*"The use of excessive violence is one of the fundamental characteristics of American policing. The excessive use of force symbolically communicates the unquestionable authority of the state in the affairs of the citizenry[1]."*

COMES NOW, Plaintiffs Davida Vigil, Kricynda Halverson, and Maria Martinez, by and through their counsel, Baumgartner Law, L.L.C., and respectfully submits this Complaint against the Defendants and allege the following:

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 USC §1983, §1988, the Fourth and Fourteenth

---

[1] Manning, Peter and Lawrence Redlinger (1970: 99). <u>Police Work</u>. Cambridge, MA: The MIT Press.

   Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331, §1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 USC §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3. Plaintiffs Davida Vigil (hereinafter "Vigil" or "Davida"), Maria Martinez (hereinafter "Martinez" or "Maria"), and Kricynda Halverson (hereinafter "Kricynda" or "Halverson") is and was at all relevant times a citizen of the State of Colorado.
4. Defendant City of Northglenn is a Colorado municipality.
5. Defendant officer Jordan Gillette who is at all times relevant to this complaint employed as a Northglenn police officer and a citizen of Colorado.
6. Defendant officer Cameron Woods who is at all times relevant to this complaint employed as a Northglenn police officer and a citizen of Colorado.
7. Defendant officer Luke Schwartz who is at all times relevant to this complaint employed as a Northglenn police officer and a citizen of Colorado.
8. Defendant officer Priscilla Duke who is at all times relevant to this complaint employed as a Northglenn police officer and a citizen of Colorado.
9. Defendant officer Luke Schwartz who is at all times relevant to this complaint employed as a Northglenn police officer and a citizen of Colorado.
10. Defendant officer Jeremy Mayns who is at all times relevant to this complaint employed as a Northglenn police officer and a citizen of Colorado.
11. Defendant officer Joel Mayns who is at all times relevant to this complaint employed as a Northglenn police officer and a citizen of Colorado.
12. Defendant officer Dylan Chavez who is at all times relevant to this complaint employed as a Northglenn police officer and a citizen of Colorado.

# GENERAL ALLEGATIONS

**A. Facts Specific to the use of Unconstitutional Excessive Force Against Martinez.**

13. On April 7, 2020, Maria Martinez had pulled out of a parking spot at her apartment complex and was preparing to leave.

14. Unbeknownst to Martinez, Joel Mayns (hereinafter "Mayns") and fellow officer Dylan Chavez (hereinafter "Chavez") were engaged in proactive policing techniques while on foot patrol in Martinez's apartment complex.

15. Specifically, Mayns and Chavez were randomly checking license plates to see if the vehicles are reported stolen or are attached to any outstanding warrants.

16. Mayns and Chavez requested that the ADCOM dispatch run the following license plate: 523-QFY. At the same time, a third officer named Jeremy Mayns (hereinafter JPMaynes") ran the same license plate number.

17. JPMayns' inquiry into the license plate number 523-QFY indicated the car was not stolen and was properly registered.

18. Despite being properly registered, Mayns and Chavez heard what they wanted to hear because they were looking for a confrontation with a "bad guy."

19. Plaintiff Maria Martinez alleges and believes that Mayns and Chavez, along with the other officers present, were told by dispatch that a car with a Florida license plate bearing 523-QFY was reported stolen. Maria's car, which came up as properly registered on JPMayns inquiry, has Colorado tags.

20. However, because Mayns and Chavez wanted to get into a confrontation with a "bad guy" they intentionally disregarded the information from dispatch saying the stolen vehicle had Florida license plates.

21. Without hesitation Mayns and Chavez effectively went into what one can colloquially call "cowboy mode," pulled their firearms out and chased after Martinez.

22. Mayns and Chavez have now foolishly and idiotically created a very dangerous situation. Both officers, with their guns drawn are chasing after an innocent citizen who is driving a vehicle (i.e., deadly weapon) and if she makes one wrong move, or the officers place themselves into what they perceive as danger, she will die because the officers are trained and conditioned to see everything as a deadly threat no matter the totality of circumstances.

3

23. Once Mayns, Chavez, and JPMayns caught up to Martinez they screamed at her in panicked, frightened, undisciplined tones with commands to stop the vehicle while pointing guns at her head.

24. Martinez, an innocent citizen now being accosted by scared, frightened, and undisciplined officers with guns pointed at her head must, and does, professionally and calmly stop her vehicle.

25. Mayns panickily screamed at Martinez to shut the vehicle off and take the keys out of the ignition. Martinez, who is the only person behaving calmly, collectively and rationally, turns the vehicle off and lets Mayns know that there is only a key FOB.

26. Mayns, still panicked, undisciplined, and full of anger and rage toward whom he thinks is a car thief screams at Martinez get out of the vehicle. Martinez fully complies and while watching how officer Mayns is behaving becomes frightened and realizes there is a good chance the panicked officers will kill her. Martinez opens the vehicle door and exits calmly, albeit while very frightened. Mayns, Chavez and JPMayns still have their guns pointed at Maria's head.

27. With a significant amount of anger and rage, Mayns grabs Martinez's left wrist with a hard control compliance technique (which is only to be utilized when a 'subject' is not complying and actively resisting an officer) and slammed her onto the hood of the car with such excessive force that he caused significant pain and bruising and reaggravated a back injury. Chavez and JPMayns still have their guns pointed at Maria's head while she is bent over on the hood of her car even though she is fully compliant while Mayns continues to employ a hard control compliance technique on a non-resistant, compliant citizen.

28. While exiting the vehicle Martinez did not pull her arms away or attempt to flee. At no point did Martinez represent a flight risk or a danger to any individual. Martinez did not make any movements that would indicate she was going to try and fight, resist, or flee from the officers. Yet, Mayns, Chavez and the other officers on scene kept guns pointed at Maria's head and then Mayns utilized a painful hard-hand control technique to subdue a person that is being fully compliant with unreasonably panicked, scared and undisciplined officers.

29. Martinez was fully compliant with the officers but was nevertheless deeply afraid that in their panicked, frightened, and undisciplined state they would kill her even though she was

complying with every command. Maria Martinez is Hispanic – she knows that police officers are conditioned to be afraid of racial minorities, interpret even the most mundane movements as threatening, and will thus kill minorities without hesitation or provocation and as such believed in this moment she was going to die at the hands of scared and undisciplined police officers.

30. Before Martinez was placed in handcuffs, but after causing her injury, Mayns and Chavez realized they made a big mistake – the vehicle was not stolen. This realization only occurred because Mayns and Chavez ignored information telling them that the car they began to chase after was not stolen. It was only at this point did the officers cease pointing their guns at Maria's head.

31. Once they realized their mistake, Mayns and Chavez did not apologize to Martinez but began lying about how the mistake occurred.

32. Martinez became visibly upset and demanded to speak with a supervisor after she started to shake and cry.

33. Martinez now understands that she was one innocent move away, if interpreted incorrectly by one of the panicked and undisciplined officers, from being murdered by police officers who would later lie through the claims that they "were in fear for their lives" and "training and experience tells us certain movements are evidence of hostile or deadly intent."

34. Since the incident Martinez has lost all faith in law enforcement and continues to have mental and emotional problems connected to her near-death experience such as losing weight and taking depression medication.  In fact, Maria moved to Monument, Colorado because the very same police that assaulted her with unconstitutional and excessive force, and almost killed her constantly roam her now former parking lot and she is deeply afraid to be anywhere near these officers.

35. Furthermore, Martinez has continued to experience pain in her wrist and back because Mayns used an unreasonable and unconstitutional amount of force on an innocent individual exiting a vehicle willingly and compliantly.  In fact, Maria now has a significant crack in one of her vertebrae disks which causes her legs to go numb on occasion and she has had to stop running and working out.

**B. Facts Specific to Davida Vigil and Kricynda Halverson**

36. On April 10, 2020, Northglenn police officers were contacted about a robbery that occurred at a Lowes Hardware store.

37. A reporting party named B.F. called the police from Lowes and told them a younger Hispanic male in a black hoodie with tattoos grabbed items and ran out of the store. B.F. chased the young man on foot and told police dispatch the individual entered a silver Nissan Maxima with only a single driver and the Maxima drove away. B.F. returned to the Lowes.

38. After the Maxima left Lowes another patron who was in a black Mazda gave chase and followed the suspected shoplifters.

39. A male named S.H. along with his wife T.H. chased after the Maxima in their black Mazda and actively gave updates to the police about where the Maxima was headed.

40. S.H. and B.F. made it very clear in their conversations with police that the male shoplifting suspects were driving a Nissan Maxima with temporary Colorado license plates.

41. After a few minutes of high speed driving the Maxima pulled off the main roads and into the parking lot of a Tamale Kitchen located at 1030 W. 104th Avenue, Northglenn, CO.

42. Police officers Cameron Woods (hereinafter "Woods") and Priscilla Duke (hereinafter "Duke") were the first to arrive at the Tamale Kitchen. Both officers went to the drive through line of the Tamale Kitchen and after supposedly identifying the Maxima began asking other vehicles to back up and clear the area.

43. As it turns out, Woods and Duke identified a Pontiac containing two women rather than a Nissan Maxima carrying a male. This is an unreasonable mistake because the vehicle logos for Pontiac and Nissan vehicles look exactly nothing alike and literally say the brand name on the logo:



44. Woods and Duke made the error because they were not behaving with any discipline or focus. Both officers knew they were looking for a male in a Nissan and because of their undisciplined imposition identified a Pontiac with two female occupants as the suspect vehicle.

45. The officers, while asking other vehicles to clear the drive through area so an arrest could be made, were able to clearly see the vehicle they falsely identified as the one carrying shoplifters was actually a Pontiac containing two female occupants.

46. Officer Jordan Gillette (hereinafter "Gillette") arrived on scene just before the officers would make an attempt to effectuate an arrest.

47. At this point, Gillette, Woods, Duke and a fourth officer named Luke Schwartz (hereinafter "Schwartz") arrived on scene and pulled their guns out and pointed them at the heads of Vigil and her young daughter Kricynda Halverson before giving any verbal commands to exit the vehicle. There was never any reason for the officers to automatically treat this situation as one where their lives are in serious danger from a suspect. The officers escalated the danger rather than de-escalated which is in violation of their written department policy.

48. The officers began screaming, in panicked, frightened, high pitched voices commands for Vigil and her Kricynda to turn the vehicle off, exit the vehicle, and slowly walk backwards towards the officers with their hands up. Guns remained pointed at Vigil's and Kricynda's head.

49. Vigil and Kricynda were fully compliant and scared for their lives. Vigil personally realized that the officers, due to their panicked and frightened state, were likely going to shoot her in the back of the head and kill her. Vigil nearly collapsed thinking that the officers might murder her daughter. Vigil and Kricynda are Hispanic and know police officers will readily shoot and kill anybody who is a minority even if they are compliant with police commands because law enforcement has been conditioned to fear racial minorities and interpret even the most mundane and innocent movements as hostile requiring serious or deadly force. Vigil truly believed that she and Kricynda would be murdered by the Northglenn police.

50. Due to Vigil and Kricynda remaining calm while being accosted by frightened and undisciplined officers their lives have not been unnecessarily taken.

51. Despite being fully compliant with officers' commands, Gillette employed a hard hand control compliance technique against Vigil, which is only supposed to be used when an individual is not complying with commands, with enough anger and rage to cause Vigil to scream out in pain because a rotator cuff tore. While being grabbed, Gillette and other police officers kept loaded guns pointed at Vigil's head even though she had not done anything other than fully comply with unreasonably frightened and undisciplined officers. The guns remained pointed at Vigil's head after being placed in handcuffs.

52. Kricynda had a gun pointed at her head despite being fully compliant with officer commands and in this moment believed she was going to be murdered by the Northglenn police. Eventually, Kricynda was placed in handcuffs but still had a gun pointed at her head even after being placed in handcuffs. Kricynda believes it was defendant Schwartz that kept a gun pointed at her head even after she was placed in handcuffs.

53. Vigil complained at least 10 times to the officers on scene that Gillette had caused serious injury to her shoulder. Gillette, Woods, and Duke all ignored Vigil's complaints and let her sit in the back of a squad car, without her daughter, for over 45 minutes. Vigil's constant complaints were ignored with deliberate indifference. These complaints were ignored because Woods, Gillette, and Duke wanted Vigil to be in pain; their unnecessary aggression is just a mere glimpse of the personal hatred and anger they carry every day towards fellow citizens accused and suspected of criminal activity. To this day, Vigil still experiences pain in her shoulder and neck from Gillette's unreasonable use of force.

54. After being forced to sit in a squad car with serious injuries to her shoulder for over 45 minutes Vigil was informed that she and Kricynda were free to go. Dukes, Woods, and Gillette did not ever call for medical attention despite knowing, based on their trainings, that people who are injured and do not receive care while put in awkward positions (i.e., sitting with their hands cuffed behind their back) will experience greater damage and pain.

55. The officers on scene did not apologize to Vigil or Kricynda and failed to explain how such an egregious error of mistaken identity could be made by supposedly well trained, highly disciplined professionals.

56. Vigil has friends and family members in law enforcement. She has always given the law enforcement community the benefit of the doubt when accused of wrongdoing. Now, Vigil and Kricynda cannot look at a police officer without fear because they understand how close they became to being murdered at the hands of panicked and undisciplined Northglenn police officers.

57. Vigil and Kricynda will never be able to trust or respect law enforcement again.

### C.  Facts Specific to City of Northglenn's Liability to Maria Martinez, Kricynda Halverson, and Davida Vigil

58. On September 26, 2018, in the Northglenn/Thornton Sentinel, Northglenn police chief Jim May made the following proclamation: "The way to reduce crime and reduce the fear of crime is a proactive approach, not reactive. Currently, I think we are reacting to the calls for service.[2]"

59. Northglenn police officers are taught, formally and informally, from the very first day they join the department that they should treat every citizen encounter as a possible deadly interaction because people will do anything, even kill a police officer, to avoid being arrested and going to jail. These are empirical falsehoods and/or misrepresentations – policing is actually far safer than anybody is led to believe[3].

60. Nevertheless, Northglenn police officers are taught to be paranoid and overly aggressive, especially in robbery and burglary cases where the department falsely claims is a great risk of being killed by an offender trying to flee apprehension because according to Bureau of Justice statistics no police officers were feloniously killed during a burglary or robbery from 2015 to 2019[4].

---

[2] Smith, Kevin (2018).  Chief Outlines need for Northglenn Police; Council Considers Adding Two Officers in 2019.  Northglenn/Thornton Sentinel.  September 26, 2018.  https://northglenn-thorntonsentinel.com/stories/chief-outlines-need-for-northglenn-police,269968.

[3] Politifact (2020). https://www.politifact.com/factchecks/2020/aug/27/chris-larson/yes-police-were-208-more-likely-kill-be-killed-cri/; Jones, Alexi and Wendy Sawyer (2020). Not just "a few bad apples": U.S. police kill civilians at much higher rates than other countries.  Prison Policy Initiative. https://www.prisonpolicy.org/blog/2020/06/05/policekillings/.  Asher, Jeff and Ben Horwitz (2020). How Do the Police Actually Spend Their Time? https://www.nytimes.com/2020/06/19/upshot/unrest-police-time-violent-crime.html.  Fleetwood, Blake (2015). Police Work Isn't as Dangerous as You May Think. https://www.huffpost.com/entry/how-dangerous-is-police-w_b_6373798.

[4] https://www.bjs.gov/content/pub/pdf/leoka19_tables_rev.pdf.

61. Proactive policing strategies means there will be greater contacts between police and citizens, especially in areas primarily made up of minority populations. The internal biases of police departments generally, and the Northglenn police department specifically is that crime is higher in areas dominated by racial minorities and that racial minorities are thus inherently threatening merely in their existence as people.

62. Currently, it is unclear if proactive policing in practice is actually the most effective method for reducing crime[5]. That said, researchers inquiring into the efficacy of proactive policing have raised concerns regarding racial bias and excessive uses of force by police officers that are engaged in a proactive policing strategies because techniques such as "hot spots", stop-question-frisk and broken windows policing requires officers to be aggressive in their approach to criminal investigations [6].

63. Empirical research has demonstrated that police officers are much more likely to use excessive force on individuals if they are racial minorities (i.e. Black or Hispanic)[7].

64. Thus, proactive policing will increase the chances of unconstitutional uses of force by police officers especially if the individuals being investigated, accosted and arrested are racial minority.

65. Plaintiffs allege and believe that all Northglenn police officers generally taught how to write reports that seem to indicate they are following use of force guidelines or justify uses of force that would normally be unconstitutional while being trained to be aggressive and employ typically unconstitutional uses of force in their daily activities. This is referred to as "testilying." Plaintiffs allege and believe that all Northglenn police officers are trained to use excessive force and then write reports after the fact in a manner that would give the appearance that their uses of force were necessary and reasonable.

66. The Northglenn police department claims to pride itself on training their officers to engage in de-escalation techniques. However, the reality is that Northglenn police officers are

---

[5] Lum, Cynthia; Christopher Koper; Xiaoyun Wu; William Johnson and Megan Stolz (2020). *Examining the Empirical Realities of Proactive Policing Through Systematic Observations and Computer-Aided Dispatch Data*. Police Quarterly. https://doi.org/10.1177/1098611119896081.
[6] The National Academies of Sciences Engineering and Medicine (2018). *Proactive Policing: Effects on Crime and Communities*. The National Academies Press. http://nap.edu/24928.
[7] Terrill, William and Michael Reisig (2003). *Neighborhood Context and Police Use of Force*. Journal of Research in Crime and Delinquency, 40(3): 291-321; Holmes, Malcolm (2000). *Minority Threat and Police Brutality: Determinants of Civil Rights Criminal Complaints in U.S. Municipalities*. Criminology, 38(2): 343-368; Smith, Brad and Malcolm Holmes (2014). *Police Use of Excessive Force in Minority Communities: A Test of the Minority threat, Place and Community Accountability Hypotheses*. Social Problems, 61(1): 83-104.

trained to escalate the violence or risk of violence in every citizen interaction because their primary, trained instinct, is to view every citizen interaction, no matter how benign the reason for the interaction, as being a deadly situation requiring an escalation in force even though empirical data demonstrates such perspectives as based on untruths and falsehoods. Hence the reason for Northglenn police to draw guns on citizens and keep them aimed at their heads for extended periods of time and use of hard hand control compliance techniques to inflict significant pain against compliant citizens which is in violation of department policies. In other words, the department policies in regard to constitutional uses of force are just "words on paper" that have no real meaning to police officers out on patrol.

67. By and through their training, Northglenn police officers are actually trained to be unreasonable. Northglenn police officers can only view citizens suspected of criminal activity as actual threats to their lives and bodies. Northglenn police officers cannot view even the most innocent of movements as anything other than a possible deadly threat because of the way they are trained and socialized by the department's culture.

68. Prior to Chief May's desire to expand the use of proactive policing strategies the Northglenn police department already had a culture that promoted and applauded officers illegally using excessive and deadly force. This lawless culture has never been changed and the Northglenn police department does not want it to change.

   a. In *Jeperson v. Magness et al.*, Case No. 16-cv-00416-NYW (D.Colo.2016) Northglenn police officers used unreasonable and excessive force while arresting Mr. Jesperson who was merely intoxicated while unarmed and at home.

   b. In *Estate of Strong v. City of Northglenn*, Case No. 17-cv-01276-WJM-SKC (D.Colo. 2017), Northglenn and three of its officers were accused and sued for using excessive and deadly force in the course of making an unannounced, no-knock search warrant of a home while the family was sleeping, resulting in over 20 gunshots to Mr. Strong, one or more of which were made at very close range, and that pulpified the wounded areas of his body and obscured the path of many bullets.

   c. In *Rojas v. Anderson et al.*, Case No. 11-cv-01200-DME-KLM (D.Colo. 2011), Northglenn and three of its police officers were accused of and sued for using excessive force in the course of arresting and transporting Oliver Rojas who was unarmed, intoxicated, and in front of his home at the time.

    d.  Finally, in *Minella/Patscheck v. City of Northglenn et al.*, Case No. 19-cv-03317-NYW (D.Colo. 2019) the actions of Northglenn police officers which led to the killing of Jeremy Patscheck and paralyzing of Serina Minella resulted in a $9 million dollar settlement to the victims of Northglenn police.

    e.  In every single one of the aforementioned actions the officers were praised for their illegal conduct by Chief May and the entire Northglenn police culture.

69. Despite the lawless culture that exists in the Northglenn police department over the years Chief May has been and continues to promote an aggressive proactive approach to policing which he and other decision makers know will lead to increases in illegal uses of force against citizens – especially minorities.

70. Northglenn Police are taught and encouraged by the department on a whole, informally and formally, to be overly aggressive and always use overwhelming force when seizing individuals based on the false claims and promoted biases that individuals being arrested will often and likely fight back to avoid going to jail.

71. For the Northglenn police department every citizen they encounter poses a risk of death or serious bodily injury even when the citizen is fully compliant and makes no actual attempt to flee from or fight an officer. In fact, Northglenn police's own situational force model suggests that a firearm may be pointed at a citizen in order to get compliance even if there is no reason to believe the citizen poses a threat. In other words, Northglenn police officers are trained to believe it is reasonable to immediately escalate any situation into one possibly requiring deadly force. No reasonable jury will disagree that the Northglenn Police's policy is unreasonable and actually encourages escalation of violence and tensions rather than de-escalation.

72. The training regime and culture of the Northglenn police department is the moving force behind Plaintiffs' injuries.

### D. Well Established Law in Colorado

73. Long ago Justice Robert Jackson wrote in *Brinegar v. United States*, 338 U.S. 160, 180-182 (1949) [dissenting opinion] the following:

> The Fourth Amendment is not a mere second-class right but belongs in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual, and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have delt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates, and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.
>
> But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court. Only occasional and more flagrant abuses come to the attention of the courts…If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches and seizures of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.

74. Maria Martinez, Kricynda Halverson, and Davida Vigil are forcing this court to hear about unlawful searches and seizures committed by the Northglenn police that would normally escape attention.
75. It is clearly established in the 10th Circuit that the Fourth Amendment prohibits the gratuitous use of force against fully compliant and subdued individuals who pose no threat to anyone. *McCowan v. Morales*, 945, F.3d 1276 (2019); *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir.2007). There is simply no legitimate justification for the use of force when a person poses no threat or has been subdued. *McCoy v. Meyers*, 887 F.3d 1034, 1052 (10th Cir.2018).
76. It is clearly established in the 10th Circuit that pointing a loaded gun at a person's head, especially if it is a child, is in and of itself excessive when a person has submitted to the

officer's show of force without resistance and where an officer has no reasonable cause to believe that a person poses danger rather than merely hold a weapon in a fashion ready for immediate use. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192-1194 (10th Cir.2001). See also: *Smith v. Wampler*, 108 Fed.Appx. 560 (10th Cir. 2004)(finding: threats of excessive force, even in the absence of physical injury, constitutes excessive force under the Fourth Amendment).

77. It is clearly established in the 10th Circuit that police officers violate the Fourteenth Amendment when they are deliberately indifferent to an individual's pain when in police custody. *McCowan v. Morales*, 945 F.3d 1276 (10th Cir.2019).

## CLAIMS FOR RELIEF
## CLAIMS UNDER FEDERAL LAW, 42 U.S.C. §1983

78. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

79. The Fourth Amendment of the U.S. Constitution prohibits unreasonable or excessive use of force in connection with searches and seizures. While detaining, restraining, and/or arresting a person, the Fourth Amendment protections only allow police officers and deputies to use the amount of force that is reasonably necessary under the circumstances

## FIRST CLAIM FOR RELIEF
### Violation of the Fourth Amendment of the United States Constitution
### Excessive Force Resulting in Injury
### (By Plaintiffs Against Defendants Gillette and Mayns)

80. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

81. A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officer intentionally restrains the freedom of a person to simply walk away. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

82. The law in the 10th Circuit is clearly established: police officers using force on an effectively subdued individual that is not actively resisting violates the Fourth Amendment. *McCoy v. Meyers*, 887 F.3d 1034, 1052 (2018).

83. Both plaintiffs were seized the moment officers drew their guns and pointed it at their heads and began giving commands.

84. Both plaintiffs were fully compliant with all commands given by police officers and thus subdued. Neither plaintiff gave officers any reason to belief they were a threat.

85. Despite being fully complaint, subdued and non-threatening both plaintiffs were subjected to painful, hard control techniques which are, by department policy, designed to overcome resistance.

86. Gillette and Mayns know that by law they are not supposed to use painful control techniques on compliant, subdued, non-resistant and non-threatening individuals.

87. However, Gillette and Mayns behaved unreasonably and gratuitously employed unreasonable and unconstitutional force against plaintiffs causing physical and mental injuries.

## SECOND CLAIM FOR RELIEF

**Violation of the Fourth Amendment of the United States Constitution**

**Pointing a loaded gun at a compliant, subdued and non-threatening person**

**(Plaintiffs against Gillette, Woods, Duke, Schwartz, Chavez, Mayns, and JPMayns)**

88. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

89. At all times both plaintiffs were compliant, subdued and non-threatening during their interactions with all defendants.

90. Nevertheless, all of the defendants kept their guns pointed at plaintiffs' head causing Vigil, Halverson, and Martinez to panic and experience severe emotional distress because they believed they were going to die despite being cooperative, non-resistant and subdued.

91. Plaintiffs believed they were going to die because despite being fully compliant, subdued, and non-threatening, all of the defendants never stopped pointing their guns at their heads. For Vigil, Gillette only put his gun away after he began employing the hard hand control technique that caused physical injuries, but other officers kept their guns pointed at her head for an unknown amount of time even after she was placed in handcuffs. For Martinez, JPMayns and Chavez kept their guns pointed at her head after Mayns began employment of a hard hand control technique.

92. Plaintiffs continue to suffer emotional distress at the memory of having loaded guns pointed at their heads and believing that they were within seconds of being murdered by police officers.

## THIRD CLAIM FOR RELIEF

**Violation of the Fourth Amendment of the United States Constitution**

**Unreasonable Seizure**

**(Plaintiffs against Defendants Chavez, Mayns, JPMayns, Woods, and Duke)**

93. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.
94. Plaintiffs were innocent of any crime. There was never any probable cause or reasonable suspicion to believe they were guilty of a crime at any time.
95. Martinez was seized because Chavez and Mayns did not listen to their dispatch who told them that the stolen car they thought they identified had Florida license plates. Martinez was seized because JPMayns had run his own independent check and knew Martinez's car was not reported stolen but did not relay the information to Chavez or Mayns. These mistakes which nearly led to the murder of Martinez are unreasonable and no reasonable jury will believe otherwise.
96. Vigil was seized because Woods and Duke identified the wrong type of vehicle with markings differing from the suspect vehicle and different gender than the suspect. The mistakes by Woods and Duke that led to the near murder of Vigil and her daughter are unreasonable mistakes and no reasonable jury will believe otherwise.
97. As a result of the unconstitutional seizures Plaintiffs have suffered physical and emotional injury.

## FOURTH CLAIM FOR RELIEF

**Violation of the Fourteenth Amendment of the United States Constitution**

**Deliberate Indifference to Injuries**

**(Davida Vigil against Defendants Woods, Gillette, and Duke)**

98. Plaintiff Davida Vigil incorporates by reference herein all preceding allegations set forth in this Complaint.

16

99. Once Vigil was seized, suffered serious injury at the hands of Gillette and placed into the squad car in handcuffs she was under police control and care.
100. Vigil continually complained of serious pain in her shoulders which was ignored with deliberate indifference.
101. Duke, Woods, and Gillette know that if a person is in pain and does not get treated the injuries will get worse and cause greater harm to the individual.
102. The purpose for ignoring Davida's pleas for help was punitive. Gillette, Woods, and Duke wanted Vigil to suffer because they wrongfully assumed she was a criminal. Gillette, Woods, and Duke have no room for mercy, empathy, or sympathy for anyone they deem a criminal. Gillette, Woods, and Duke want people they deem as criminal to experience as much pain as possible.
103. As a result of the deliberate indifference by Woods, Gillette, and Duke, Davida Vigil's injuries became significantly worse and the pain and follow up treatment she required was not only to her shoulders but neck and back area.

## FIFTH CLAIM FOR RELIEF

**Unconstitutional Customs and Practices; Failure to Train Resulting in a Violation of Constitutional Rights.**

**(Plaintiffs against City of Northglenn)**

104. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.
105. The City of Northglenn has ultimate decision and policymaking power in regard to the training and supervision of Northglenn police officers.
106. Northglenn police officers have a long history of using unconstitutionally excessive force.
107. Police officers in Northglenn are taught to practice their profession in a proactive manner. Unfortunately, but predictably, proactive policing will lead to police officers making false arrests and seizing innocent people and unconstitutional uses of force.
108. The Northglenn police department has a use of force policy officers are theoretically supposed to follow. However, in order to be proactive, Northglenn police officers are taught to be, at the onset, overly aggressive and forceful in virtually every situation they have with citizens which is contrary to their own use of force policy.

109. Northglenn police officers do not wear body-worn cameras. As such, Northglenn police officers are taught to write their reports with certain "buzz-words" to make it look like their actions are reasonable for reviewing supervisors and attorneys.

110. Northglenn police officers are not being trained to follow their use of force policies or what is constitutionally permitted. Instead, Northglenn police officers are being taught to use excessive force in virtually every situation and use clever and untruthful wording in their reports which are written after the fact and without secondary sources to confirm the stories to circumvent the Constitution and make their actions look lawful.

111. The City of Northglenn knows there is an obvious need to train police officers on the constitutional limits of force when interacting with citizens.

112. The City of Northglenn knows, based on already established law in the 10th Circuit, that police officers are not supposed to use soft or hard hand control techniques which are designed to cause pain and overcome resistance on individuals that are subdued, complaint, and non-threatening.

113. Nevertheless, the City of Northglenn is not properly training its officers, and thus behaving with deliberate indifference to the rights of citizens of Northglenn and Colorado to be free from excessive force because the long history of excessive force violations in Northglenn, Colorado and the United States shows poorly trained officers will violate a citizen's Fourth Amendment rights.

114. This behavior by the City of Northglenn is not only a failure to adequately train police officers on the proper uses of force when executing their duties but reinforces a culture of lawlessness that has long existed in the Northglenn police department.

115. These failures are the moving force and proximate cause of Plaintiffs' injuries

116. All of these failures by the City of Northglenn and Northglenn police department are the moving force and proximate cause to Plaintiff's injuries.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor against Defendants and award them all relief as allowed by law and equity including but not limited to the following:

    a. Actual economic damages, if any, as established at trial;

b. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

c. Punitive damages for all claims as allowed by law in an amount to be determined at trial

d. Declaratory relief and injunctive relief as appropriate;

e. Appropriate equitable relief;

f. Pre-judgment and post-judgment interest at the highest lawful rate;

g. Attorney's fees and costs; and

h. Such further relief as justice requires.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 11th day of February, 2021.

Respectfully submitted,
BAUMGARTNER LAW, L.L.C.
*Original signature on file at Baumgartner Law, L.L.C.*

 *s/ S. Birk Baumgartner*
S. Birk Baumgartner, #47829
Baumgartner Law, LLC
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (720) 626-9418
Fax: (720) 634-1018
Íbirk@baumgartnerlaw.com


 *s/ Matthew J. Greife*
Matthew J. Greife, #43487
Baumgartner Law, LLC
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (720) 626-9418
Fax: (720) 634-1018
matt@baumgartnerlaw.com

<u>Plaintiff's Address</u>:
c/o Baumgartner Law, L.L.C.
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113